Case number 20-1152 et al. National Hot Rod Association petitioner versus National Labor Relations Board. Mr. Roberts for the petitioner, Mr. Francisco Fitzmaurice for the respondent. Good morning, your honors. This is Charles Roberts. May it please the court, I'm here on behalf of the National Hot Rod Association. Let me start by saying that the National Labor Relations Board conducts hundreds and hundreds of representation elections each and every year, and having appeared before the board for more than 40 years, I can say they generally do a bang-up job, a class-A job. Unfortunately, in this case, this is one of those rare cases where, in all candor, the regional office in Newark just simply dropped the ball in its supervision of this national mail ballot election. Specifically, it sat on requests from two employees for duplicate ballots for four and five days, thereby ensuring that they could not cast a ballot in a timely fashion. Now, this was an election that was decided by a single vote, so if either one of those two employees was disenfranchised under the board's precedence, then that would be a basis for denying enforcement to the board's order. Now, when we first presented this case, it was our initial belief that this was negligence on the part of the board or the regional office, that they had simply provided an incorrect phone number or one that was not regularly monitored. That was based on the testimony of one of the employees as to what he was told by one of the supervising board agents. But now, in this court, and this is the first time the boards had to take an official position on it because they weren't really a party down below, so they've taken the position that they did, in fact, monitor this phone number, which, in our view, makes their failure even more egregious in the sense that it was a conscious decision, apparently, not to respond to these requests. Now, let me kind of frame the legal issues. I mean, there's no question based on the board's precedence in this court's decisions in Antelope Valley that, in a disenfranchisement case, the employer or the party that's objecting has to show two things. One, it has to show that there was some election irregularity that is attributable to either the board or a party, and two, it has to show that a determinative number of voters were possibly disenfranchised. It's not certainty of disenfranchisement. It's the possibility of disenfranchisement, and it's an objective test. Now, the board's position in this case appears to be that there was no election irregularity at all, and we find that position to simply be untenable. We start with the fact that there was basically a 17-day window period. The ballots went out or mailed out on November the 15th. They were to be counted on December the 2nd, so you had a 17-day window period, and the notice of election told employees that if they had not received a ballot by November 22nd to contact the board immediately. The record reflects that on the following morning, November 23rd, which was the 11.56 a.m., employee Robert Logan left a voicemail on this particular number that had been provided requesting a duplicate ballot. Based on the board's representation that it monitored the phone number, it apparently consciously refused or declined to send a ballot out that same day, even though it sent out three duplicate ballots to other employees the same day, two of whom were able to return timely ballots. Now, the following day was Thanksgiving, and then on Friday, December the 25th, another employee, Paul Kent, left a voicemail at 11.32 a.m. requesting a duplicate ballot, and employee Logan, not having heard anything back at 3.21 p.m., made a second request for a duplicate ballot. Again, no action was taken on these on Friday, November the 25th. Over the weekend, Logan attempts to find out phone numbers and emails and eventually obtains a phone number, which he contacts apparently on Monday, and is able to reach the board agent. At that day, they send out a ballot to him, but by now we're November the 28th. He's in Michigan. The regional office is in Newark, and the chances of him receiving a ballot in a timely fashion have been severely diminished, and in fact, he does not receive it in a timely fashion. Strangely, even though they sent him a ballot that day, they waited until the next day, Tuesday the 29th, to send Kent a ballot. So here we have, it's hard, there's just no way you can say this is not an election irregularity attributable to the board, and what's frustrating is it's wholly unexplained. There's never been any explanation. If there were some justification, we should have heard it by now, but basically, so what you have is they sat on these requests for four and five days, thereby preventing a ballots, and then we get to the second stage of it, which is were they possibly disenfranchised. As I said earlier, we know that Logan, if they had sent him a ballot on the 23rd, two of the three employees who got ballots that day or were sent ballots that day, one in Missouri, one in Nevada, were able to return ballots in a timely fashion. So we know that Logan could have cast a timely ballot if he'd been mailed one that day. Even on the 25th, the day before the weekend after Thanksgiving, you're still seven days from the election. It's certainly reasonably possible that Kent could have received his ballot in a timely fashion. So what we have here is basically an unexplained failure on the part of the board. As I say, it's the exception, it's not the rule in these board cases. As far as you're concerned, Mr. Roberts, am I oversimplifying your case by simply saying that the case, as far as you're concerned, the case can turn just on Logan, correct, alone? That is correct. Because Logan, let's see, the notice from the regional office said that employees who don't receive a ballot by a certain date must communicate immediately. He did that twice to the designated phone number. Yes. So in your view, does that resolve the case? Yes, I do. If you agree with me on Logan, there is no need to address the other. I mean, a single vote... Nor is there any need, in your view, to go beyond the fact that the board gave him two numbers, he called one of them twice, got no response. End of the matter, as far as you're concerned? Yes. I will just say quickly that to the extent that the judge found he could have called the other number, there was no need to. And the board's position is they knew they had already received his voicemail. Leaving another voicemail would have been pointless. So we think he complied with what was... The agreement, the notice didn't say he had to call them both, right? It said either or, but the judge said he should have done more. And we dispute that position. But yes, Logan is the most clear cut of the ones, and I think he's disenfranchisement issue. Do we need to reach the second issue about whether the board abused its discretion in not opening the ballots? Well, the only difference would be in remedy, Your Honor, because on the first issue, the remedy, as I see it, is deny enforcement. The board then has to revoke the certification and hold a rerun election. On the second issue, in theory... Wait, wait, wait, counsel. I think Judge Rao asked you whether you do need to even discuss the second issue if we decide in favor of you on the first issue. Well, my only point was is that on the remedy on the second issue could be if the court ordered the board to open those three ballots, which could, in theory, shift the vote to where it's no longer determinative, in which case... But counsel, isn't your correct answer that if we decide, as Judge Tatel pointed out, if we decide in favor of you with respect to Logan, isn't that the end of the case? I'm happy with that result. I will stand on that, Your Honor. Happy? That's your isn't it? It is, Your Honor. Mr. Roberts, I think that there may be some difficult exhaustion questions with respect to the second issue, which is one of the reasons I asked whether we need to even reach the second issue. I will gladly... I hate to say waive the second issue, but certainly stand on the first issue and take the position that if the court were to rule in our favor, we certainly have no request that you visit the second issue. Only if you obviously... Can I just understand? I just want to understand your point about that. And I don't want to push this any further than we need to, but I understood your argument on that being that if they open those, you might win the election, right? That is the point, Your Honor, but... But then let me follow up on what Judge Rao said. She mentioned exhaustion. Did you raise this issue with the board? Opening the ballots? It's raised... Where did you raise that? It's raised in the objections... You raised... It's in the objections that were filed. The objections pointed out that there were still 17 challenge ballots that had yet to be opened and that these ballots... In essence, there was no final tally of ballots on December the 2nd. There were 17 challenge ballots that were... 15 of which were opened eight months later. And in our objections, we asserted that that wasn't a ground that they could be opened along with those ballots. We did not, in all candor, we did not subsequently, after the objections, go back to the region and say, hey, you need to reopen these at the same time. So we did not reiterate the request, but the request was made in the objections, which are in the record. I don't have the page numbers before me, but they are in the joint appendix. All right. Well, thank you. Any other questions, Judge Rao, Judge Silliman? No. No questions. Okay, we'll hear from the board then. May it please the court. My name is Brady Francisco Fitzmaurice. I represent the National Labor Relations Board. We're here seeking enforcement of its order, finding that the company violated section 85 and 1 of the act when it refused to recognize and bargain with the union after the majority of its television production employees voted in support of the union in a mail ballot election. I'd like to start off. There are just a few points I'd like to clean up based on Mr. Roberts' argument that I think could bear correcting. A point was raised that the board admitted in briefing that it monitored the phone line and intentionally sat on it. Could you just go back to the beginning? Could you just, instead of cleaning up these spots, could you just respond to his final point that, look, this case turns on Logan himself. Logan, quote, Logan did exactly what the notice said. He, quote, communicated immediately, very next day, called one of the two numbers. There was no response. Mr. Roberts says that's, that's it, ends the case. Sure, I'm happy to do that. So, so, and all the employees, the issue here is whether, no, no, just, just, just Logan, just stick with the facts. He called the board's designated number twice, got no response. He did. He, on November 23rd, Wednesday, the day before Thanksgiving, he left a voicemail requesting a duplicate ballot be sent to him. He did so again on Friday, the 25th. That's correct. Now, what the board found was that under the circumstances that Mr. Logan was aware of, the urgency of the election and the count being scheduled to take place the following week, he didn't do everything he could have. He didn't follow every avenue available to him to request a duplicate ballot. The second phone line was available to him and he did not call that. But the, the notice did not say you had to call both of them. That's correct. The notice used the word or giving the local phone line, as well as the national phone line. However, you know, in the stipulated election agreement that the parties voluntarily agreed to, the parties agreed that, you know, these requests should be in by five o'clock on Tuesday, November 22nd. Wait a minute, counsel. Wait a minute. Wait just a second. Look, you suggest that he should have done the extraordinary thing of calling the second number. But why would that have been any good when you've admitted in your brief that you monitored the first number? So as to the first number, you know, the board's position is that it was the company's burden to prove that that line was not monitored and the company... Wait, wait, wait, wait, wait, you admitted you monitored. Well, what we wrote in our brief was that the evidence did not prove that that line was unmonitored and that there's evidence suggesting that the line was in fact monitored. Another employee... Oh, that's enough. I read your brief as stating that it was monitored. So why in God's name can you take the position that he should have called another number? You already received his request. Of course, the board did receive his request and responded to it on Monday, November 28th. It's five days later. Yes, that's correct. Which is, you know, given the weekend on the holidays to business... The only point I'm making is the second number argument that you're making doesn't make any sense when you admit you received his request at the first number. Well, with respect... You did that when you did that. Council leaped on it because you were hoist on your own petard. Your Honor, notwithstanding that quip, I have to respectfully disagree that it wouldn't matter. You know, Mr. Logan was under the circumstance where he knew that he had waited until, you know, the absolute last day he could expect to receive the He was not aware, you know, at that time that the request would be received or processed, and rather than call the other number available to him, decided to wait and then call the same number again the following business day on Friday. So, you know, I don't think it's an extraordinary request or burden to ask someone to call a second phone number. And the board found that... Why? What good would that do when you monitored? You received his first number. I don't see your position. He could have got the chairman of the National Labor Relations Board's phone number in Washington and called that too. I think my point is that, you know, a second phone number would have gone to a different person who may have answered the phone and then he may have had a conversation. So, in other words, you're basically admitting the first person he talked to was incompetent. No, I'm not, Your Honor. He didn't speak to anyone on the 23rd. He left a voicemail. Somebody read it and somebody did nothing. No, that's not right, Your Honor. What the board did was, after receiving that voicemail on Monday, the 28th, sent out the duplicate ballot to Mr. Logan. The counsel for the company stated that on the 23rd, the region sent out three duplicate ballots, but for some reason didn't send out Mr. Logan's. It is true that the region sent out three duplicate ballots on the 23rd, but the record does not disclose when those duplicate ballots were requested. So, it's not the fact, the record does not show that, you know, on the 23rd, the board received three requests and Logan's and decided only to respond to those three and not Logan's. It may have been the fact that those three requests were made previously and there may have been a lag of one or two business days. I don't know. That's not shown in the record, but the broader point is that no matter what... A few minutes ago, you said that you thought it was irrelevant that Logan waited to the last minute, but, right? That's what you said. But the notice says, employees who did not receive a ballot by November 22, by November 22, should communicate immediately. That's what he did. There's nothing that suggests he needed to act, that it was irresponsible for him not to try to get a ballot on November 19th or November 20th, is it? You're absolutely right, Your Honor. I don't mean to suggest that... So then that's not relevant, right? Well, no, it is relevant. Why? What I'm saying is two things. One, you know, the board made clear that it was not going out of its way to default Mr. Logan in the pejorative sense, and that's language from a board case for sale. But at the same time, the board recognized that, you know, as you get closer and make sense to do everything you can to request the duplicate ballot. But look, you know, you mentioned the agreement also. Now, the agreement and the notice are different. I can see your point if we were arguing the agreement, because that says that employees who didn't get a ballot should contact the region's office by no later than November 22nd. But the notice says if you don't get it by November 22nd, contact us immediately. I just don't see how it's at all relevant that he waited until that date. Yeah, you're absolutely right, Your Honor. The notice doesn't have that exact time, but it wouldn't have made a difference. So then what's left of the board's argument here? He called the number twice. It's either that he should have called the other number, but as Judge Shilbury points out, the board has conceded that it wasn't monitored. So what's left? No, Your Honor, the board has not conceded that either phone line was not monitored. I have to make that clear. No, no, no, no, no, no, no, no. It's worse. You conceded it was monitored. So in other words, you... That's what I meant. I misspoke. Sorry. I misspoke. Right. So what happened here was Mr. Logan on the 23rd called the phone number at the region to request a duplicate ballot. Even if the board had sent, had received that voicemail and the very instant sent out a duplicate ballot, it would not have made a difference. Mr. Logan's original ballot was sent out on November 15th, the same day that the original ballots went out to each and every individual. He didn't even receive his original ballot or the duplicate ballot until after December 2nd, the day of the official ballot count. So his situation can be chalked up solely to the vagaries of mail delivery and the courts have held uniformly that the vagaries of mail delivery are not a reason to overturn an election. I would also point to the third and second circuit cases noting that perfection is not what's required in an election. If that were the case, employees might never achieve their choice of representative. There are always going to be, you know, certain things that pop up here and there. It's very unfortunate that Mr. Logan didn't receive either of his ballots in time to vote and that the board noted that that's regrettable, of course. However, it's not a basis for overturning the results of this election where 73 percent of the employees in the unit did cast timely ballots. The board successfully processed 21 requests for duplicate ballots and many of those employees cast timely ballots. To overturn the results of the election would be to take away all of those employees' choice of representative. I see that I've gone over time here. So unless anything else, Judge, shut your mouth or something. Anything else? No. The board thanks the court for its time and we ask that it enter judgment in full. Thank you. Mr. Roberts, you can take a minute if you would like it. Yes, I just... Do you want to say something? I won't count this against you. What about this argument about the vagaries of mail delivery? That was what I was going to respond to. Okay. The possibility is not the certainty and the fact that the original ballot wasn't received till after the time after the deadline says nothing about whether the second ballot would have been delivered on time. As I say, two of the three people who were mailed ballots on the 23rd returned them. One from Missouri, one from Nevada. We cannot say that that delivery to Michigan would not have been made in a timely fashion. Logan was obviously interested. He was clearly making the effort and basically all we have to show is that there was a reasonable possibility that he could have voted and that vagaries don't come into it. We would ask that the board's order be denied enforcement. Thank you. Okay. Thank you very much. The case is submitted.
judges: Tatel, Rao, Silberman